FILED 9 SEP '24 11:13 USDC-ORP

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF OREGON

Murville Lavelle Lampkin,
            Plaintiff

v.

United States of America,
            Defendant

No. __3:24-cv-01516-AN__

VERIFIED COMPLAINT
JURY TRIAL DEMANDED

FEDERAL TORT CLAIMS ACT

Plaintiff brings this action under the Federal Tort Claims Act ("FTCA"). These claims stem from actions that took place while the Plaintiff was under the care and custody of the Federal Bureau of Prisons ("BOP"), Federal Correctional Institution Sheridan ("FCI Sheridan") while serving a sentence of 240 months.

## JURISDICTION

Pursuant to 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), 2671-80 et seq., the Federal Tort Claims Act gives federal district courts exclusive jurisdiction over claims against the United States for "injury or loss of property, or personal injury, or death caused by the negligent or wrongful act(s) or omission(s)" of a federal employee "acting within the scope of his office or employment."

Plaintiff brings this action against the United States for actions committed by BOP employees who caused him personal injury, emotional distress (by means of verbal threats, intimidation, fear of assault, retaliation and other ways), cruel and unusual punishment in violation of the Eighth Amendment, negligence and other wrongful acts relating to the intentional loss and destruction of his personal property, harrassment, and other acts that, when combined, will show other injuries have occurred both physically and emotionally.

## PARTIES

Plaintiff is a federal inmate currently incarcerated at the Federal Correctional Institution, Lompoc II in Lompoc, CA

Defendant United States of America, 950 Pennsylvania Ave., Washington, D.C. 20530.

## DEFENDANTS

United States of America
Bureau Of Prisons
Collette Peters
Warden Hendrix
Captain Cerone
John Doe #1    Acting Captain
John Doe #2    Lt.
A/W Bills
Lt. Ilten
John Doe #3-30     Officers Raiding Unit 3B
Jane Doe #1-8      Officers Raiding Unit 3B

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Prior to filing this action, the Plaintiff filed two difference Tort Claims to the BOP Western Regional Office regarding the loss of his property as argued herein. That office assigned two claim numbers: TRT-WXR-2022-06786 (filed while Plaintiff was incarcerated in FCI Sheridan) and TRT-WXR-2024-00875 (filed when Plaintiff arrived in Lompoc after departing FCI Sheridan after receiving no response on the 2022 claim). Plaintiff received two letters when he contacted the Western Regional Office for a status update on his claims (see Exhibit "A"). The acknowledgment of receipt for the 2024 claim indicates a maximum of six months in which to make a final determination of his claim which expired May 14, 2024 (see Exhibit "B").

These forms were received by the Western Regional Office as indicated by the issuance of tort claim numbers and acknowledgment of receiving status update letters. Therefore, this court can be assured Plaintiff has exhausted his administrative remedies to no avail and thus this action is before this court.

## PROVISIONS

The Plaintiff requests that the following provisions by applied to the claims and causes of action herein where appropriate.

### Jailer - Prisoner "Special Relationship"

The Ninth Circuit has long held that there is a "Special Relationship" between "jailer and prisoner," which imposes a heightened duty of care on the jailer to the prisoner. It is well established that a duty exists when "the relationship of the parties [is] such that the Defendant [is] under an obligation to use some care to avoid or prevent injury to the Plaintiff." See Markowitz v. Ariz. Park Bd., 146 Ariz. 352, 706 P.2d 364, 368 (Ariz. 1985), superseded by statute on other grounds as recognized in Maher v. United States, 56 F.3d 1039 n.4 (9th Cir. 1995). See also Minneci v. Pollard, 565 U.S. 118, S.Ct. 617, 624-25, 181 L.Ed.2d 606 (2012) (noting that California's tort law regarding a jailer's duty of care to protect prisoners from harm "reflects general principles of tort law present, as far as we can tell, in the law of every State"). Here, a special relationship existed thereby giving rise to a duty of care.

The staff referenced herein are employees of the BOP (jailer) and the Plaintiff is a prisoner under their custody and care, therefore giving the BOP a heightened duty of care. The Plaintiff relies solely on the BOP for safekeeping, medical care, food, clothing, and other things needed for one to complete a sentence in a federal prison including, but not limited to, safekeeping of their personal prop-

2

erty and to be free of threats of retaliation or violence by BOP staff as argued herein. Defendant is legally required to provide these duties to the Plaintiff pursuant to 18 U.S.C. §§ 4042(a)(2) and (3).

## Law Enforcement Proviso

Pursuant to the "law enforcement proviso" of 2680(h), Congress created an exception to the general prohibition on intentional torts under the FTCA for claims arising out of the actions complained of herein. Prison staff are "law enforcement officers" for purposes of the proviso. In Bramwell v. US Bureau of Prisons, 348 F.3d 804, 807 (9th Cir. 2003) the court opined "The U.S. Supreme Court has specifically held that intentional misconduct by a BOP officer gives rise to a cause of action under [law enforcement proviso in] Section 2680(h)" citing Carlson v. Green, 446 U.S. 14, 20, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)

## Discretionary Function Exception A :
### Defendants Conduct Rose to the Level of Violating the United States Constitution

The majority of the claims that the Plaintiff brings stem from the Defendant, by way of its agency BOP and their employees' actions against the Plaintiff, for him engaging in protected activity. These actions and conduct rose to the level of violating the Plaintiff's constitutional rights. The discretionary function does not shield decisions that exceed constitutional bounds, even if such decisions are imbued with policy considerations. The government "has no 'discretion' to violate the Federal Constitution" (Owen v. City of Independence, MO, 455 U.S. 622, 649, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

The absence of a limitation on the discretionary function exception would yield an illogical result: the FTCA would authorize tort claims against the government for conduct that violates the mandates of a statute, rule, or policy, while insulating the government from claims alleging on-duty conduct so egregious that it violates the more fundamental requirements of the Constitution. See Loumiet v. United States, 828 F.3d 935, 944-45, 424 U.S. App. D.C. 113 (D.C. Cir. 2016).

To be clear, the Plaintiff is not bringing constitutional claims in this action, but only arguing that the conduct of the Defendant rose to the level of violating the constitution, thus voiding the discretionary function.

Discretionary Function Exception B:
Carelessness and Similar Acts

The Ninth Circuit has long held that carelessness voids the "discretionary function exception." See Keller v. United States, 771 F.3d 1021 ("carelessness would not be covered by the discretionary function exception, as it involves no choice or judgment grounded in public policy consideration." See also Padilla v. United States, 2012 U.S. Dist. LEXIS 195217, 2012 WL 12882367 at *6 (C.D. Cal. 2012).

## CLAIMS & CAUSES OF ACTION

Emotional Distress

In September of 2022, Plaintiff was housed at FCI Sheridan in Unit 3B, cell #120 at the time of the incident complained of herein. During that time, an outside group of BOP employees (known as the S.O.R.T. Team) was brought in from institutions in Lompoc, CA and Victorville, CA. Plaintiff was told that they were there to "shake up" the prison based on the lawsuits being filed by the inmate population. During the month, Plaintiff saw 40-50 staff members he did not recognize posted all over the prison conducting various tasks. They would enter housing units in groups of 3-5 people.

This S.O.R.T. Team was aggressive and threatening towards myself and others while cursing at the inmates during pat searches. After about a week that team entered my housing unit between 6:30 a.m. - 7:30 a.m. screaming and yelling at the inmates. Team members went from cell to cell passing out green canvas bags and trash bags for the inmates to put their property into. They were told that if their property did not fit into the bag given to them then it would be thrown in the trash.

The team members then started to remove inmates from their cells, grabbing them by their neck and screaming at them with various orders. I packed all of my property into the green bag that was given to me including the most important items first, such as photo albums. These albums contained photos of Plaintiff's daughter and grandchild who had passed away March 16, 2020 and containing over 1,000 photos as well as dozens of letters. The photos were the only thing left that Plaintiff had to remember his daughter and grandchild therefore, they were priceless and irreplaceable. Plaintiff survived in prison through hard times and remained emotionally stable by way of having those photos in his possession.

Also included was another photo album of his grandparents who passed away just months after his daughter and grandchild. The grandparents were the only

4

family Plaintiff knew after his mother was killed when he was just 7-years-old. Plaintiff ensured those photo albums were placed in the property bag based on the sentimental value alone.

When one of the team members opened Plaintiff's cell (#120) he was screamed at and told to turn around and walk out of the cell backwards. Numerous property bags littered the floor forcing Plaintiff to turn around and walk normally to avoid tripping on the bags and possibly causing injury from a fall. When this occurred one of the team members yelled at Plaintiff "I fu*king told you to turn around!" Several other officers were yelling instructions making it virtually impossible to be able to follow each instruction simultaneously. These actions caused even more confusion once Plaintiff was grabbed and forcibly pulled out of his cell backwards. One officer told Plaintiff to go right while another told him to go left which caused him to be pulled and shoved against the door for not knowing which way to go. Plaintiff contends these actions were purposely done in order to allow the team members to be able to use force against the inmates who were confused on which instruction to listen to.

A team member then told Plaintiff to not be "so fu*king tough because we let sex offenders walk the yard'.' in reference to allowing those convicted of sex crimes the ability to be in population without any incident. After some time, Plaintiff was directed to go outside where the temperature was high and the staff provided just one 3-4 gallon water jug for the 120+ inmates and no cups were provided to drink from. After 6-7 hours Plaintiff was allowed back into his unit. He was directed to retrieve his property bag and directed to a newly assigned cell within the unit.

Once inside the cell, Plaintiff noticed that his property bag was wet and his property in the bag was covered in liquid soap. Plaintiff then noticed the missing photo albums.

Plaintiff saw Associate Warden Bills walk by and proceeded to stop him in order to ask about his missing property. Bills was informed by Plaintiff why the photo albums were important and Bills informed Plaintiff that they must be somewhere and doubted anyone threw them away. After informing the Plaintiff that they will probably show up, Bills walked away.

Plaintiff was drawn to tears as he now believed that his photo albums with photos of deceased family members were gone. This caused severe emotional distress which took Plaintiff years to recover from and still relives that moment to this day.

Plaintiff eventually went to the Psychology Department after one of the teachers at FCI Sheridan, Ms. Pennington, saw the Plaintiff upset and asked what

was wrong. Plaintiff then told her about the photo albums and arranged for a staff member to take him to psychology to talk more. Plaintiff spoke to a Ms. Motzol and discussed his loss of the photo albums and she offered to go to the trash containers and look for his property.

Hours later, Ms. Motzol approached the Plaintiff in Unit 3B and told him she could not find his lost photo albums in the trash containers and seemed to be as distraught about the loss as the Plaintiff was.

A few days later during the breakfast meal, Plaintiff and other inmates were told that a Lieutenant from another BOP institution was handing out "lottery tickets" to inmates in building #2 who could go to the building where the property was located and rummage through the items and take whatever they wanted. This blatant act caused the Plaintiff to lose not only his cherished photo albums but most of his property including food, hygiene, beverages, clothing, etc. The Plaintiff advised Captain Cerone of this "lottery" and was told he would look into it. The photo albums were never found which led to the tort claim being filed in 2022.

Although the time limit for responding to the tort claim has long expired, Plaintiff still retains rights for a civil remedy through this action in order to address the loss as well as other grounds herein and attempt to obtain relief.

I, Murville Lavelle Lampkin, am not a lawyer nor do I have any schooling in law and thus do not know the format of this brief. Therefore, I respectfully ask this court for leniency on the rule of law and process.

In September of 2022, I was incarcerated at FCI Sheridan. I was housed in Unit 3B, cell #120, at the time of this incident. At the end of August or September, an outside group of the institution's S.O.R.T. Team was brought to FCI Sheridan from Lompoc and Victorville. The stories inmates were told is that they were there to "shake up" the prison because of the lawsuits that the inmates were filing against the prison. In that month, I saw 40-50 new staff faces who were posted all over the prison and would enter the units in groups of 3, 4 or even 5. They were aggressive and threatening towards inmates, cursing at them while conducting a pat search. After about a week or so, they went into Unit 2 and made inmates pack all of their belongings into green canvas bags (typically used for inmates going to the SHU) in which some were smaller than others. There weren't enough bags so some inmates had to use trash bags. Inmates were told by staff assigned to Sheridan on a daily basis that they wanted no part of what was going on in Unit 2.

About a week later they came to Unit 3B around 6:30 - 7:30 a.m. About 40 officers came into the unit screaming. They then went from cell to cell passing out green canvas bags and trash bags telling inmates that if their property doesn't fit into the bag then it gets thrown away. After about 15 minutes they started at cell 101 and began pulling inmates out of their cell, grabbing them by the back of their neck and screaming at them. Several officers gave orders that conflicted with the other officers so when an inmate asked who to listen to or which order to follow, they were slammed against the wall or taken down to the ICE room (where there aren't any cameras) and assaulted. I saw inmate Aarans (sp?) taken there and saw inmate Zeno slammed to the ground and dog piled by several officers. Inmates were taken out and made to walk by a scanner several times. I, along with my cellmate McVay-Hite, packed all of our property in the green bags that we were given. I packed the most important things to me first, such as photo albums. My daughter and grandchild had passed away on 3-16-20 and I had a large photo album with over 1,000 pictures and 25-40 letters from my daughter. That photo album was the only thing left I had of my daughter and grandchildren and were priceless to me. They helped me emotionally get through the hard mental struggles I deal with at times. I also had a photo album of my grandparents, John and Hazel Schwulst, who passed away just months after my daughter and grandchild. My

7

grandparents raised me from the age of 7 after my mother was killed. They were the only parents I really knew. So, I made sure that these irreplaceable items made it into the bag. I had a laundry bag with institutional clothing and a laundry bag full of food that did not make it into the green bag. When the officer opened cell #120 they screamed at us to turn around and walk out of the cell backwards. There were bags all over the floor so I stepped over the bags to turn around and walk out. The officers started to yell and curse "I f*cking told you to turn around". There were several officers giving demands to me all at once so I didn't know who to listen to. I had both of my hands broken in 7 places so I can't afford to take a fall; my hand can't take the impact which is why medical has placed me on a lower bunk. Once I turned around I was grabbed and forcibly pulled out of the cell backwards. I was told to go to the right and also at the same time told by another officer to go to the left. This was the confusion they were doing on purpose to get you to stop or turn and ask which way so they could assault you and slam you around. I was then pulled to the left (I believe) and shoved against the door. The officer stated something about "not being so f*cking tough because we let sex offenders walk the yard." I was then pat searched and told to go to where the scanner was. I was then pat searched again and told to walk by the scanner and then told to go to the yard. We were on the yard outside in hot weather and only had one 3-4 gallon water jug for 120-126 inmates with no cups to drink out of. I had to use a plastic wrapper to hold water in order to drink. After about 6-7 hours outside, we were sent back to our unit. As we got back to the unit we were stopped and then directed to go to our cell, pick up our bags and then given a new cell to go to. I and my cellmate, McVay-Hite, were moved from cell #120 to cell #222, I believe. As I got into my cell I immediately started going into my bag. I noticed that all of my belongings was wet and covered in liquid soap. I was hoping that my photo album and legal work was okay but my albums were gone. I asked my cellmate to look in his bag to see if they were there, but they were not. I looked out my window and saw the Associate Warden, Bills, walking by. I then knocked on the door to get his attention. I told him that my photo albums were missing and why they are so important to me. He stated something along the line of "Well, they are here somewhere. I doubt if anyone has thrown them out." I told him that they are my life and important to me while asking him if he could ask about them, while other items were still in the unit with the staff. He told me that they would show up and he walked away as if I was bothering him. I was upset and started to cry because I felt I would never see them again. My

8

cellmate tried to help me and got Officer Palmer to come to the cell door. I told Officer Palmer that my photo albums are missing and they are of my daughter and grandchild that passed away along with a photo album of my grandparents who also passed away. He said he would do what he can and walked away. Later that day, we were given 5 minutes to shower but we had no towel or even clothes to change into. We had to dry off using a dirty shirt and put it back on wet and dirty. Officers made comments like this is what you get when you let sex offenders run the yard. At one point they made inmate Harriet move to 3A telling him he lost cell #118 to a sex offender and started to laugh as it was a joke to them. I asked the group of officers standing at the top corner showers if they were from Lompoc because other inmates stated that's where they are from. The reply was "Are we?" as if asking a question. None of the officers had name tags and if they did they were in black writing on black background on their vest so it couldn't be read. I was told to go back to my cell.When we were let out of our cell the next day or day after, the teacher )Ms. Pennington) was working in the unit. She saw I was upset and asked what was wrong. I told her about my missing albums so she called someone and then told me to go to the psychology department. The acting Captain, who I believe came from Hawaii, escorted me there and asked what was wrong. I told him about my missing photo albums and letters from my deceased family. He made no comment after that and just walked away leaving me at the psychology building. I was met there by Ms. Motzol and I explained why I was upset and losing my mind. She told me to relax and that I could take all the time I needed in the relax room. She then called Dr. Bindel to talk to me and had me explain my situation to Dr. Bindel. Ms. Matzol came back and told me she was going to the UNICOR building because she heard that was where our property was taken and asked me what my photo albums looked like. Ms. Motzol came back and said she didn't find them there but was going to keep looking. I went back to Unit 3B and a few hours later Ms. Motzol came to find me. She was dirty and a mess and accompanied by another female staff member I have never seen before. She stated she had been going through the trash in the dumpster looking for my photo albums. She was upset and wiping away tears saying she was sorry she couldn't find them. She told me the problem was a dumpster was removed the night before and it may have been in there. I thanked her for the hard work she put in on trying to find the albums then she left upset. I talked with Captain Galberth about my missing photo albums and he stated he would look into it and try to see what happened to my items. Captain Galberth at this time was being transferred to Unit Manager of Building 4. About 35-45 inmates went to see Captain Cerone the next day because we were

9

told he was the new captain and asked about missing property. We found him out-side the chow hall in front of commissary. Everyone was complaining about miss-ing property and no confiscation forms being given to inmates. As he was talking, a group of staff walked up (S.O.R.T. team members from Victorville and Lompoc), told him to shut the f*ck up and told the inmates to get moving. I couldn't believe that I just heard an officer talk to another staff member like that, let alone a captain. It was clear that FCI Sheridan staff was intimidated by this crew and afraid to stand up to them with the exception of CMS worker Holbrook. We were told that Officer Holbrook stood up to one of them and was punched in the face giving him a black eye. Captain Cerone said he would be gone for a week or two and he would look into the missing property. The food items I did have were covered in liquid soap and smashed. I took a big bag to my counselor, Adigbite, and he asked me what this bag of food was about. I told him to reach in the bag and grab some food. When he pulled his hand out he stated "What the hell?" as his hand was covered in soap. I explained to him that this was done on purpose because there was no soap in the bag, something that may have acciden-tally opened. He told me that he was keeping the bag of food to show the Captain when he returned. Case Manager Baker and Hoerner also saw the bag of destroyed food. A few days later as we were going to breakfast, we were told that a Lieu-tenant from another prison is giving out lottery tickets for the property left in UNICOR that belonged to other inmates. He gave the numbered tickets to inmates in building #2 when the owners of the property were in building #3. This lieutenant let other inmates go into UNICOR with a laundry bag and fill it with whatever and whoever's property that they wanted. I showed up and talked to the Lieutenant and told him this isn't right; he was giving away property that belongs to inmates in building #3 and also told him I was missing photo albums and property. Prior to this happening, inmates from building #3 who received confiscation forms were called to the UNICOR building to get their property or mail it home. My cellmate, McVay-Hite, was called up but the prop-erty they tried to give him was mine and he told them that. The next day they called me but could not find my property from the day before.

I told the lieutenant I was missing photo albums from my deceased family and asked him how he would feel if someone gave away his dead daughter's photos. He stated that he "doesn't have kids and don't give a shit." I walked away mad and knew if I stayed around I would say something that would get me thrown in the SHU. I talked to Officer Pennington and Dr. Hunter because they were assigned to give inmates their property back or send it home or donate it before the lottery raffle. They did not remember seeing my photo albums. After

10

the raffle inmates confronted other inmates who they saw with their property. Some got their stuff back while others had to buy their stuff back. I asked inmates in other units to ask about my photo albums and told them what they looked like and why I wanted them so badly. Many inmates came to me to ask if my photo albums had turned up, but they never did. Captain Cerone returned and I approached him about the lottery. He said that several people told him about it and he can't believe they did that and was going to look into it. After not getting a clear answer from anyone, the prison handed out tort claims in the unit and told us if we had missing property that we could fill out a tort claim and we did not need to complete a BP-8 or BP-9, etc.

I filled out a tort claim and attached a copy of my receipts. I got a response back with tort claim # TRT-WXR-2022-06786 . After several weeks inmates were being called to the lieutenant's office to try and clear up their tort claims unofficially by paying inmates in stamps and commissary. I waited to be called but never was. I approached Captain Cerone about my tort claim status and he told me that he had 200 on his desk and it will take awhile. After a few weeks I saw him again and he told me he couldn't find mine. I went back to my cell and got Captain Cerone with Lt. Ilten my tort claim number. Cerone told me to get back with him in a few weeks which I did, yet he said he still couldn't find my file. After a few more weeks he told me he had found it and that Lt. Laradon was handling my claim and that he would get with me soon. Over the course of a month several staff asked me if I was okay because everyone was talking about my missing photo albums. I told a staff member that I had a tort claim in and that Lt. Laradon was investigating it. Staff told me that Lt. Laradon was on sick leave for 6 then retiring and not coming back to work. I approached Captain Cerone and asked how my tort claim was going and that I haven't seen Lt. Laradon around. He told me that he's around and I would just have to catch him at mainline sometime. I told him that he's on sick leave for 6 months, then retiring, and not coming back. He stared at me, shocked, for knowing that information. He said he'll give it to Lt. Morano or Lt. Ilten. I asked him to give it to Lt. Ilten because I already had an issue with Lt. Morano taking commissary that was on my cell door. He then stomped on the food and kicked it to the trash can. An officer with the last name of "R" (Roberts possibly) was doing count with him. The next morning I asked Roberts why he did that and he stated he didn't know and that it was uncalled for. If I reported it he would state that it had happened. I didn't report it because Morano or his wife, who worked in the education department, would retaliate.

On July 19, 2023, I ran into Lt. Ilten in the metal shack. I asked him about

11

my tort claim and he told me he hasn't found it. I informed him that I was transferring to another prison on July 20, 2023. He told me he would find it and get the report done so it can get reviewed and moved to the next stage. When I talked to him in the chow hall and explained the situation he told me "It's clearly staffs' fault" but my tort claim is too much that the BOP attorney would have to deal with me because it's more than the prison is allowed to issue.

When I transferred I was first sent to Pahrump, NV. While there I sent Lt. Ilten a letter asking about my tort claim and never heard back. I wrote him again and never heard back. I got the feeling that they were trying to get to the two year point (statute of limitations) so I couldn't file for relief in federal court. I wrote to the regional office to ask about my claim and was sent a letter stating once the investigation was done I would be notified. I arrived at FCC Lompoc in September, 2023 and was called to R&D to receive my property. I was happy to get it because when I left Sheridan prison they didn't let me pack my property or give me a property form. Lt. Michaelson and Officer Slevic stated to me and inmate Flenory that all of our property would be sent to us. While in R&D at Lompoc the officer called my name along with about 20 other inmates. When the officer started to open my property box he pulled out something big and pink. He stated "What the hell is this?" as he pulled out a 4-foot long, 3-foot high, pink blow-up flamingo that one could ride on in a swimming pool. The next thing he pulled out were some type of children's toys. The officer asked me if I was an "S.O." (sex offender) to which I answered no. He then reaches in and pulled his hand out covered in pink grease and states "looks like the flamingo took a shit all over your stuff. Who did you piss off?" I stated it's most likely because my tort claim that I filed about the raid on the prison the year prior. He asked if I knew him because he was there and part of the raid. I told him no because I didn't want to be targeted. There were only a few items of mine in the box. All of my legal work was missing including my tort claim. My photos, dentures, radio, shoes, bowls, and a lot of other items were missing. It was clear that I was being retaliated against since only staff has access to an inmate's property and an inmate can't put a flamingo in an inmate's property, let alone even get their hands on one.

All of this can be viewed on video in R&D as well as the raid at FCI Sheridan. When I wrote to the BOP attorney I asked that the video of those days be preserved for evidence purposes.

12



**U.S. Department of Justice**

**Federal Bureau of Prisons**

_____

Western Regional Office
7338 Shoreline Drive
Stockton, California 95219

**FEB - 7 2024**

Murville Lampkin
Reg. No. 14112-006
United States Penitentiary
3901 Klein Blvd.
Lompoc, CA 93436

Re: TRT-WXR-2022-06786

Dear Mr. Lampkin:

This is in response to your recent inquiry regarding the status of your claim, no status reports will be given. You will be contacted if additional information is needed. The agency will notify you on the determination of your claim once the investigation has been completed.

Sincerely,

Dominic Ayotte
Deputy Regional Counsel/CLC Supervisor

DA/jmv

## PROPERTY DAMAGE LIST

Photo albums with 1300 plus pictures and over 25 hand written letters

Food

Hyigene

Sweats

Property missing and food destroyed was turned over to Counslor Adigbite for inspection.

Copy of tort claim has full list of property damage that defense has copy of. Mr. Lampkin's original copies were destroyed by staff in transfer of July 19, 2023.

## WITNESS LIST

Unit Manager: Mr. Galberth (Unit 4)
A/W: Mr. Bills
Dr. Hunter
Dr. Bindle
Ms. Motzol
Captain Cerone
Lt. Ilten
Mrs. Pennington (Teacher)
Officer Pennington
Officer Palmer
3B Counsler Adigbite
3B Secretary Thomas
Officer Coyle
Officer Wright
Officer Q
Case Manager Baker
Case Manager Hoermer

FEDERAL CORRECTION INSTITUTION SHERIDAN
PO BOX 8000
SHERIDAN, OR 97378

## INMATE WITNESSES

Mc Vay - Hite
Kenny Carlson                    Released To Probation
Mario Hoskins                    Released To Probation
Ted Dounge                       Released To Probation

## OTHER WITNESSES

United States Senator            SEE LETTER ATTACHED
Ron Wyden
Jeffrey A. Merkley

# United States Senate

WASHINGTON, DC 20510

August 18, 2022

Colette Peters
Director of Federal Bureau of Prisons
320 First St., NW
Washington, DC 20534

Dear Director Peters,

Congratulations on your appointment as the new Director of the Bureau of Prisons (BOP). We look forward to working together in the best spirit of the Oregon Way to make necessary changes that will ensure the health, safety, and constitutional rights of incarcerated people are protected. We write today with deep concern about allegations of retaliation by guards against inmates at the federal correctional institution in Sheridan, Oregon (FCI Sheridan) and also about issues hurting the mental health of federal inmates nationwide. We respectfully request an update about both of these significant and troubling issues.

We are concerned about recent press reports that there has been retaliation and violence against inmates at FCI Sheridan for speaking out about their experiences regarding unaddressed medical needs, small cell confinement, and limited access to family and lawyers as a result of the pandemic. Inmates' claims of retaliation for speaking out include violence, targeted cell shake downs, and the tossing of personal items, such as medications. The fact that these actions coincide with the inmates' ongoing federal petition alleging conditions at FCI Sheridan violate their constitutional rights make these reports more troubling.

With this commitment in mind, please answer the following questions about the situation at FCI Sheridan:

- What procedures is the BOP taking to ensure humane conditions at FCI Sheridan, including permitting access for inmates to meet and speak with their families, counsel, and other support systems?
- What steps is the BOP taking to ensure that inmates are not confined in small spaces for long periods of time?
- How is the BOP ensuring that the health needs of inmates at FCI Sheridan are being addressed, and what is being done to ensure that inmates are not waiting too long to be examined and treated by medical professionals?
- Is the BOP investigating claims of retaliation by guards either from FCI Sheridan or from elsewhere against inmates at FCI Sheridan? If so, please provide:
  - The actions that have already been taken by the BOP;
  - The actions that the BOP is planning to take or considering; and
  - Any other information relevant to this request.
- What information or directives has been shared with staff and inmates at FCI Sheridan about these allegations of retaliation?
- What procedures are in place to prevent retaliation by staff against inmates?
- Which specific positions, if any, are currently vacant at FCI Sheridan?

- Are you considering recommending direct hire authority for FCI Sheridan to address urgent staffing needs?

Further, we have received reports that a Special Operations Response Team (SORT) has been brought in to FCI Sheridan. Please respond to the following questions about the SORT:
- Is there a SORT or other out of district officers at the FCI Sheridan currently or in the last several months?
  - If so, how many officers are involved? Are inmates able to visually identify the names and badge numbers of involved officers?
- Why was this team brought to the FCI Sheridan? What is their role? Under what conditions will they be removed?

Our offices have also received reports about a chronic problem affecting defendants with mental health conditions in our federal criminal justice system in Oregon and nationwide. We understand there have been significant delays in access to treatment and evaluation for competency restoration for these defendants. As you know, the *Insanity Defense Reform Act* requires that the Department of Justice "hospitalize [a] defendant for treatment in a suitable facility . . . for such a reasonable period of time, not to exceed four months, as is necessary to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward." The Attorney General has delegated responsibility for meeting this requirement to the BOP. In a recent case, the Ninth Circuit weighed in on these delays and found that the BOP has violated this statutory requirement.

In order for the BOP to address this systemic problem of delayed restoration treatment and evaluation for incompetent defendants, it must revise its approach by allocating more resources and increasing capacity at either new or existing facilities. With this need in mind, please answer the following questions about the next steps the BOP is planning to take.
- How is the BOP planning to expand capacity at its current competency restoration facilities and what is the timeline for taking this step?
- Is the BOP considering expanding the number of facilities that offer treatment and evaluation by creating units in other federal facilities and by contracting with state and private facilities to implement programs that meet the federal requirements?
  - If so, what is this plan and what is the timeline for implementing it?
- Is the BOP considering the cost-effective and often successful option of engaging with local resources for in-community competency restoration?
  - If so, what is this plan and what is the timeline for completing it?
- Are there any other options the BOP is considering to address this issue, and what are they?

We respectfully request a response to these questions by no later than September 19, 2022. We appreciate that you have just begun your tenure at the BOP, but given the urgency of the situation, we welcome a quick response.

Sincerely,

Ron Wyden
United States Senator

Jeffrey A. Merkley
United States Senator

| **CLAIM FOR DAMAGE, INJURY, OR DEATH** | **INSTRUCTIONS:** Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| United States of America | Murville L Lampkin<br>FCC II Lompoc<br>3901 Klein Blvd<br>Lompoc CA 93436 |

| 3. TYPE OF EMPLOYMENT<br>☐ MILITARY ☒ CIVILIAN | 4. DATE OF BIRTH<br>8-26-72 | 5. MARITAL STATUS<br>Single | 6. DATE AND DAY OF ACCIDENT<br>July - Aug of 2022 | 7. TIME (A.M. OR P.M.)<br>6.10 AM |
|---|---|---|---|---|

8. BASIS OF CLAIM (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).  See Statement Attached

9. **PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).
Murville L Lampkin 3901 Klein Blvd Lompoc CA 93436

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).  See property list Attached

10. **PERSONAL INJURY/WRONGFUL DEATH**

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.  See motion and statement Attached

11. **WITNESSES**

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| See witness list Attached | |

12. (See instructions on reverse).  **AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
| $671,065.45 | $10,000,000.00 | | 10,671,065.45 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE<br>8-28-24 |
|---|---|---|

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident insurance? ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number. ☒ No

| 16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible? ☐ Yes ☒ No | 17. If deductible, state amount. |
|---|---|
| | *N/A* |

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

19. Do you carry public liability and property damage insurance? ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code). ☒ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filed by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

DAMAGES IN A **SUM CERTAIN** FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN **TWO YEARS** AFTER THE CLAIM ACCRUES.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* **Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.**

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
   A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

B. *Principal Purpose:* The information requested is to be used in evaluating claims.
C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is solely for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) BACK

MurvilleZZ
Federal Correctional Complex
3901 Klein Blvd
Lompoc CA 93436



CERTIFIED MAIL

9__1 0710 5270 0417 6216 80



⇔14112-006⇔
Hatfield Courthouse
1000 SW 3RD AVE
RM 740
Portland, OR 97204
United States

– Legal Mail –

– Legal Mail –